UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 17-10141-DPW |
| ) | |
| 17.  STACEY LITTLEFIELD, A/K/A STACEY ) | |
|         DOUGLASS ) | |
| ) | |
| Defendant ) | |

## UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS

On January 18, 2018, Stacey Littlefield (the "Defendant") filed a motion to suppress all evidence seized by the government resulting from a traffic stop of the Defendant's vehicle on April 3, 2017.  *See* Docket Nos. 308, 309.  The evidence obtained as a result of the traffic stop consists of approximately 60 grams of a fentanyl mixture from Melvin Weatherspoon's sweatshirt pocket, cash from the Defendant and Weatherspoon, drug paraphernalia, two cellular telephones from the Defendant, and one from Weatherspoon.  The Defendant maintains that the evidence was illegally obtained due to the lack of a credible basis for pulling the vehicle over, the allegedly prolonged nature of the vehicle stop, and the removal of the Defendant from the vehicle and subsequent pat down of her person.  The Defendant submitted an affidavit that disputes factual issues about the motor vehicle stop, but ignores the facts constituting probable cause on which the search was based.  Furthermore, the Defendant has not indicated that she is willing to submit to cross examination regarding the facts she has attempted to put in dispute. The Defendant's motion to suppress should not be further considered unless and until she does. *See, United States v. Phillipos*, 849 F.3d 464, 469 (1st Cir. 2017).

The United States opposes the Defendant's motion because the vehicle stop was based on probable cause, was not improperly prolonged, and the removal and subsequent pat-down of the Defendant was lawful.

I. **Factual Background**

   A. **Investigation Generally**

In April 2016, a confidential source (hereafter, CS-1) provided information to the Drug Enforcement Administration (DEA) about a drug trafficking organization (DTO) operating in the Lawrence, Massachusetts area, run by Juan Anibel Patrone (Patrone), a Dominican believed to be unlawfully in the United States. CS-1 explained generally that the Patrone DTO worked seven days a week, that Patrone had a customer telephone line (TT#1) which customers contacted for drugs, and that Patrone dispatched couriers and arranged for drugs to be supplied from the stash house on two additional telephones (TT#2 and TT#3). The stash house phone, TT#4, remained in the stash house and TT#4 was used by whomever was operating the stash house. CS-1 explained that Patrone used couriers who made deliveries both in cars and on foot. Based on intercepted calls, Patrone distributed drugs to customers throughout Massachusetts, New Hampshire, and Maine. Additional CSs came forward and provided information that confirmed the information provided by CS-1 about the operation of the PATRONE DTO, its couriers, stash houses, and phone numbers. During the course of the investigation, the government made undercover buys of fentanyl and cocaine from Patrone through both a CS and an undercover officer.

On November 30, 2016, the Honorable United States District Court Judge Indira Talwani signed an Order authorizing the interception of wire communications to and from Target Telephones #1 through #4. 16-MC-91357-IT. TT#3, on which this Defendant was intercepted

in communication with Patrone, was intercepted under authorization from the Court until May 30, 2017.  During the course of the investigation, based on interceptions and surveillance, Oscar Marcano (Defendant #3) was determined to be a stash house operator who reported directly to Patrone.  Based on interceptions, surveillance, and seizures, Alex Gonzalez Gonzalez (Defendant #5) was determined to be a courier of significant amounts of drugs for Patrone.  He serviced many of Patrone's larger customers and was arrested with approximately 483 grams of fentanyl at his residence on execution of search warrants.  Both Marcano and Gonzalez pleaded guilty in this matter.  *See e.g.* Docket Nos. 297 and 321.

      **B.**      **The April 3, 2017 Traffic Stop**

Investigators intercepted and monitored approximately 11 pertinent phone calls on TT3 that led to the April 3, 2017 traffic stop and seizure of the fentanyl from the Defendant's vehicle. *See* Affidavit of Michael Shinners, attached hereto as Exhibit 1; *see also* DEA Form 6 Report of Events on April 3, 2017, attached hereto as Exhibit 2, each incorporated by reference as though fully set forth herein.  As further detailed in Exhibit 2, on April 3, 2017, law enforcement initiated surveillance in the area of 277 Merrimack Street and 52 Melvin Street in Lawrence, in anticipation of a 70 gram deal of heroin/fentanyl between members of the Patrone DTO and a female later identified as the Defendant.

For example, the following phone call was intercepted on April 3, 2017, over TT3, at 11:35 AM (Session 60767), between Alex Gonzalez Gonzalez ("Alex") and Juan Anibel Patrone ("Patrone-G"):

| | |
|---|---|
| ALEX: | Tell me buddy. |
| PATRONE-G: | There is a girl going for 14 5's but don't go out without anything, check the area well to see what's up. |
| ALEX: | 14? I don't think I have all of that here. |

| | | |
|---|---|---|
| PATRONE-G: | | Go check her, entertain her, go for a walk. Call Oscar for him to bring it, check the area. |
| ALEX: | | What is she on? |
| PATRONE-G: | | It's a skinny girl that went for 2 5's. |
| ALEX: | | Alright |
| PATRONE-G: | | She is from Maine that comes from to buy. |
| ALEX: | | Alright let me check and see. |
| PATRONE-G: | | She is getting there, check it. |

[End of Call]

A few minutes later, at 11:38 PM, over TT3 (Session 60768), another call was intercepted. During the intercepted call, Patrone and Gonzalez discussed the Defendant's request for 14, and then Gonzalez put the Defendant (identified below in bold as Unidentified Female) onto the intercepted phone call with Patrone. The following is an excerpt of the conversation:

| | | |
|---|---|---|
| PATRONE-G: | | How much money does she have? |
| ALEX: | | Let me see. This woman has a lot of money, I took it. |
| PATRONE-G: | | How many 5's do you have there? [Aside: Hello] |
| ALEX: | | Let me see, 7. |
| PATRONE-G: | | Only seven 5's. |
| ALEX: | | Yes, man. |
| PATRONE-G: | | What are we going to do now? |
| ALEX: Do | | I give them to her? |
| PATRONE-G: | | No, she wants 14. [Aside: What happened honey? What do you need? Text me address, text me.] What are we going to do? |

4

| | |
|---|---|
| ALEX: | Tell me. I just called Barbita (Oscar) and he was just going to start doing it. |
| PATRONE-G: | Put her on. |
| ALEX: | Before I go to where she is, how much do I take from here if I we give this to her? I have the money here. |
| PATRONE-G: | Yes, but we have to sell it all to her, because imagine we don't accomplish anything by selling her that little. |
| ALEX: | Oh. |
| PATRONE-G: | We have to call Barbita (Oscar) to see if how soon is he going to be done. |
| ALEX: | So what you should tell her is to go to the car. |
| PATRONE-G: | Alright, tell her to go to Market Basket and give her the money and come back in 10 minutes. |
| ALEX: | Alright. |

[UF comes to the phone]

| | |
|---|---|
| **PATRONE-G:** | **How many people in your car? No problem, no police?** |
| **UF:** | **No, no, you told me when I come down trying to gather other people's money.** |
| **PATRONE-G:** | **Yeah.** |
| **UF:** | **So I got another person who had an income tax...** |
| **PATRONE-G:** | **Okay baby, go to Market Basket and come back in 10 minutes. I got 2½ fingers right now, but come back in 10-15 minutes for everything, 7 fingers, okay?** |
| **UF:** | **We'll be back.** |

[AEX comes back to the phone]

| | |
|---|---|
| ALEX: | Tell me. |
| PATRONE-G: | Give her all the money and tell her to come back in 10 minutes. |

5

| | | |
|---|---|---|
| ALEX: | Okay. | |
| PATRONE-G: | Put her on the phone and call Barbita de Escoba (broom goat tee). | |

**[UF comes to the phone]**

**UF:** Hello.

**PATRONE-G:** Honey, my friend give the money for you. Give me... come back in 10 minutes, okay? I'm ready in 10 minutes, okay?

**UF:** Come back in 10 minutes?

**PATRONE-G:** Yeah.

**UF:** Okay.

A few minutes later, at 12:23 PM, over TT3 (Session 60789), the following call was intercepted:

| | |
|---|---|
| PATRONE-G: | Did you see Oscar. |
| ALEX: | Yes, he's here, he just arrived. Listen, the woman has 2,240. |
| PATRONE-G: | Alright give 14 of five (5). What about Oscar? |
| ALEX: | Oscar is here. I already saw the guy, the other one too. |
| PATRONE-G: | Alright, be done with that woman already. Did you give it to her? |
| ALEX: | I'm taking it out now because Oscar just got here. |
| PATRONE-G: | Where is she? |
| ALEX: | She sitting right here. |
| PATRONE-G: | Where? |
| ALEX: | Here on the steps. |
| PATRONE-G: | Take care of her and have her move from there already. [Aside: Hello.] |
| ALEX: | Alright. |

PATRONE-G: [Aside: What's up?]

[End of Call]

A few minutes after that, at 12:27 PM, also over TT3 (Session 60791), the following call was intercepted:

ALEX: Tell me.

PATRONE-G: Did she leave?

ALEX: Yes, right away.

PATRONE-G: I'm going to tell her to call me when she is on the highway.

ALEX: Okay.

[End of Call]

These intercepted calls are examples of the intercepted communications regarding the Defendant's participation in the drug transaction. Law enforcement was also conducting surveillance while these calls were being intercepted.

At approximately 12:29 p.m., two minutes after Alex told Patrone that she left, TFO Poirier observed a black Chevrolet Sonic, bearing New Hampshire license plate number 4040549 (hereinafter, the "Vehicle"), parked in a parking lot alongside 52 Melvin Street Building 5. *See* Exhibit 2. TFO Poirier observed that the Vehicle was running and was occupied by a male front seat passenger, later identified as Douglas Littlefield. *Id*. A few minutes later, TFO Shinners observed a female individual, later identified as the Defendant, walk away from that building and TFO Poirier observed her get into the driver's seat of the Vehicle. *Id*. The Defendant drove the Vehicle to a nearby McDonalds and law enforcement observed Weatherspoon go from the open rear door of the Vehicle, into and out of the McDonalds a few minutes later. *Id*. Law enforcement continued to surveil the Vehicle as it travelled towards the highway. *Id*. Based on

the intercepted communications and surveillance observations, as well as their training and experience, law enforcement officers, including TFOs Poirier and Shinners, believed they had observed a drug transaction.

TFO Poirier informed Massachusetts State Police Trooper Jennifer Penton that they had just observed a drug deal. *See Affidavit of Jennifer Penton*, attached hereto as Exhibit 3 and incorporated by reference as though fully set forth herein. Trooper Penton was told by her fellow officer that the occupants of the vehicle had just participated in a drug transaction, and she was requested to assist the investigation by making a traffic stop. *Id*.

Even though the investigators believed they had probable cause to pull Defendant over and search her vehicle for drug trafficking, the Trooper understood that it was preferable to find an independent reason to pull over the Defendant so as not to compromise the ongoing investigation. *Id*. At approximately 1:00 p.m., the Defendant changed lanes without using a turn signal. *See* Docket 309 at Exhibit A. After observing this traffic violation, Trooper Penton initiated a traffic stop.[1] *Id*. At that time, Trooper Penton knew that the occupants of the vehicle were involved in drug trafficking. *See* Exhibit 3. Consistent with the discussion on the intercepted phone calls, during the course of the traffic stop, Trooper Penton seized more than 60 grams of a mixture or substance containing fentanyl from Weatherspoon's pocket. The drugs were packaged in twelve plastic tines.[2] *See* Exhibit 2. The Defendant, Weatherspoon, and

---

[1] Although no citation was issued for this violation, Trooper Penton's report, as annexed to the Defendant's memo of law, clearly sets forth her independent basis for the stop. *See* Docket 309 at Exhibit A. There is no requirement that a citation be issued in order to avoid suppression of the evidence.

[2] The intercepted communications referenced the Defendant's purchase of 14. It is not known what happened to the remaining two baggies of fentanyl.

Douglas Littlefield were arrested and charged with violations of state law. Docket 309 at Exhibit A.

II. **The Vehicle Stop Was Supported By Probable Cause**

The Defendant contends that the stop was not supported by even reasonable suspicion and that the alleged marked lane violation, described in the Trooper's report, did not occur. The affidavits of TFO Michael Shinners and Trooper Penton provide ample evidence that the stop was supported by ample probable cause to believe a crime had been committed. *See* Exhibits 1-3.

The so-called "automobile exception" to the Fourth Amendment's search warrant requirement provides that agents can stop a vehicle and search "any area of the vehicle in which the evidence may be found" without a warrant "if there is probable cause to believe a vehicle contains evidence of criminal activity." *See, e.g., United States v. Polanco*, 634 F.3d 39 (1st Cir. 2011) (discussing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)); *United States v. Lopez*, 380 F.3d 538, 543 (1st Cir. 2004). This exception allows the police to search an automobile and the containers within it without a warrant when the police have probable cause to believe that the car contains contraband or evidence of criminal activity. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798, 804-09 (1982). Further, "the justification to conduct ... a warrantless search does not vanish once the car is immobilized, nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (*per curiam*).

Probable cause to conduct a warrantless arrest exists "when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997). Courts "consider the totality of the circumstances in evaluating whether the government demonstrated a sufficient probability ... of criminal activity." *United States v. Fiasconaro*, 315 F.3d 28, 35 (1st Cir. 2002) (*internal quotes omitted*).

The Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place," and has noted that it is "a practical, nontechnical conception" based on "common-sense conclusions about human behavior." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012). "[P]robable cause is a flexible, common sense standard [that] ... merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).

Reviewing courts must examine the "historical facts" – the events leading up to the stop or search – and decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," amounted to probable cause. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Questions of law, including the question of whether a given set of facts gives rise to probable cause, are reviewed *de novo*, *United States v. Woodbury*, 511 F.3d 93, 96 (1st Cir. 2007), while factual findings are reviewed for clear error. *United States v. McMullin*, 568 F.3d 1, 5 (1st Cir. 2009).

### a. The Investigative Team Had Collective Knowledge of Probable Cause

It is settled that the investigative teams' first-hand knowledge may be imputed to Trooper Penant under the principle of collective knowledge. *United States v. Barnes*, 506 F.3d 58, 62–63 (1st Cir. 2007) ("We have recognized that reasonable suspicion or even probable cause can be established by the 'collective knowledge' or 'pooled knowledge' principle."). Nothing in the law requires the Trooper physically stopping the vehicle have first-hand knowledge of past crimes. Rather, if a member of the investigative team has probable cause, a fellow officer may rely on that probable cause and act accordingly. *Id*. Here, the Task Force had ample probable cause to support its belief that the Defendant had committed a drug crime; their probable cause belief is transferred to Trooper Penton.

### b. The Trooper Had An Independent Basis to Stop the Vehicle

In addition, notwithstanding the collective knowledge doctrine, Trooper Penant also personally observed a traffic violation, which violation permitted her to perform the traffic stop. Trooper Penton could have relied solely on the information from TFO Poirier, but her independent observations further justify the stop.

### III. The Traffic Stop Was Not Unreasonably Prolonged

A traffic stop can only continue for the amount of "time reasonably required to complete [the stop's] mission." *Rodriguez v. United States*, 135 S. Ct. 1609, 1616, 191 L. Ed. 2d 492 (2015). In evaluating the lawful duration of a traffic stop, the First Circuit recently observed:

> Once the police stop a vehicle, "the tolerable duration of police inquiries ... is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop and attend to related safety concerns."

*United States v. Clark*, 879 F.3d 1, 4 (2018) *citing Rodriguez,* 135 S.Ct. at 1616.

Here, the stop was not delayed beyond its mission – to safely issue a traffic citation and investigate the probable cause to believe a drug crime had occurred. Exhibit 3. Trooper Penton's backup was called to provide for her safety and he arrived within minutes of the commencement of the traffic stop. *Id*. Trooper Penton was alone on the side of the road, outnumbered, and about to have an interaction with three people she suspected had recently committed a drug deal. *Id*. Any delay was unquestionably justified by the circumstances.

IV. **The Removal From the Vehicle and Pat-Frisk Were Justified**

The First Circuit has consistently held that the same justification to stop a vehicle may also justify a frisk – even absent additional information. For example, "in the case of suspected 'large-scale trafficking in illegal drugs, the same information that will support an investigatory stop will without more support a frisk.'" *United States v. Belin*, 868 F.3d 43, 49–50 (1st Cir. 2017), *cert. denied,* No. 17-6860, 2018 WL 311748 (U.S. Jan. 8, 2018) *citing United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001)*. Noting that the link between drugs and violence is "legendary," the First Circuit has also extended this holding to suspected cases of street level drug transactions, "at least where the suspect also appeared unusually anxious at the time of the stop." *Belin*, 868 F.3d at 49–50; *United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014); *United States v. Ivery*, 427 F.3d 69, 70–71, 73 (1st Cir. 2005); *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988).

Here, Trooper Penant performed a traffic stop with knowledge that the occupants were suspected of having participated in a drug transaction. Exhibit 3. Armed with that knowledge, the Trooper took steps to ensure her safety, including the call for backup and the pat-frisk of its occupants. Given the "legendary" connection between drugs and violence, the Trooper's actions were justified and lawful. *Arnott*, 758 F.3d at 45.

V. **The United States Does Not Intend To Introduce The Challenged Statements During Its Case-In-Chief**

The Defendant moves to suppress the Defendant's statements to law enforcement during the traffic stop. The Defendant's motion is moot because the United States does not intend to introduce these statements during its case-in-chief. The United States reserves its right to introduce these statements during cross-examination of the Defendant, or other defense witnesses, or in its rebuttal case.

VI. **The Defendant Lacks Standing to Challenge the Seizure of Drugs from Weatherspoon's Pocket**

Even if the stop was unlawful, which it was not, the Defendant lacks standing to suppress the drugs, cash, or cell phone seized from Weatherspoon. It is settled that a Defendant must have standing to move to suppress seized property. Here, the Defendant lacks standing to suppress the drugs and money recovered from her co-defendants. The Defendant had no legitimate expectation of privacy in Weatherspoon's clothing, including in his sweatshirt pocket, and she cannot move to suppress the evidence recovered from him. *See e.g. Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S. Ct. 2556, 2561, 65 L. Ed. 2d 633 (1980) (no suppression of drugs in someone else's purse because, even though defendant claimed the drugs were hers, she had no legitimate expectation of privacy in the purse.). Of note, Weatherspoon pleaded guilty and accepted responsibility for his participation in the conspiracy based on the drugs found on his person during the car stop on April 3, 2017. *See* Docket No. 191.

VII. **The Discovery of the Money and Cell Phones was Inevitable and The Officer Acted in Good Faith**

Once law enforcement observed the significant quantity of drugs in the Vehicle and elected to arrest its occupants, it was inevitable that they would be searched incident to arrest. Even assuming arguendo the Court finds issue with law enforcement's actions, they acted in

good faith and the exclusionary rule need not be invoked here. *See United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) ("[T]he record suggests that any Fourth Amendment violation was unintentional, and is clear that application of the inevitable discovery doctrine in this case does not create an incentive for future police misconduct.").

VIII. **No Evidentiary Hearing is Warranted**

It should be noted that the Defendant has requested oral argument but has not requested a hearing. A hearing is required only if the moving party makes a sufficient threshold showing that material facts are in doubt or dispute and that the dispute cannot reliably be resolved on a paper record. *United States v. Jimenez*, 419 F.3d 34, 42 (1st Cir. 2005). The First Circuit has held failure to raise a material disputed factual issue that would entitle the defendant to the relief he seeks is grounds for denying an evidentiary hearing. *See e.g., United States v. Calderon*, 77 F.3d 6, 9 (1st Cir. 1996). The District Court has "considerable discretion in determining the need for, and the utility of, evidentiary hearings, and we will reverse the court's denial of an evidentiary hearing in respect to a motion in a criminal case only for manifest abuse of that discretion." *United States v. Phillipos*, 849 F. 3d 464, 469 (1st Cir. 2017).

The Defendant's affidavit does not place a material fact in dispute. The Defendant ignores the information provided to Trooper Penton by TFO Poirier, and the Defendant does not deny that she had just participated in a drug transaction. Even if what the Defendant alleges is true, and it is not, the intercepted phone calls and the surveillance establish ample probable cause to support the car stop and subsequent interactions and seizures.

Moreover, the Defendant's affidavit should be stricken unless the Defendant affirms that she is prepared to testify at an evidentiary hearing. Were the Court to find a material fact in dispute, the government is entitled to cross-examine the Defendant regarding the assertions in

14

her affidavit. *See United States v. Phillipos*, 849 F.3d 464, 469 (1st Cir. 2017) (upholding finding that an untested affidavit failed to establish threshold showing of factual dispute); *United States v. Baskin*, 424 F.3d 1, 3 (1st Cir. 2005) (same). Absent that opportunity, the motion to suppress should be decided on the paper record. *Phillipos*, 849 F.3d at 469 (affirming district court's denial of motion to suppress without an evidentiary hearing where defendant declined to submit to cross-examination); *Baskin*, 424 F.3d at 3 (same). In this case, there is no reason an evidentiary hearing is needed.

Respectfully submitted,

ANDREW E. LELLING,
United States Attorney

By: /s/ *David G. Lazarus*
SUSAN WINKLER
DAVID G. LAZARUS, B.B.O. # 624907
Assistant United States Attorneys
U.S. Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Dated: January 31, 2018    david.lazarus2@usdoj.gov

### Certificate of Service

I hereby certify that this document and Exhibits, filed through the Electronic Case Filing system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ David G. Lazarus
DAVID G. LAZARUS
Dated: January 31, 2018    Assistant U.S. Attorney